IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| GEORGE WINGATE, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>SCOTT FULFORD, *et al.*, )<br>)<br>Defendants. ) | Civil Action No. 1:18-cv-937 (AJT/IDD) |

## ORDER

Plaintiff George Wingate, in an early morning encounter with law enforcement officers, refused to identify himself and was arrested. He brings this Section 1983 action claiming Fourth Amendment violations, as well as false arrest/imprisonment and malicious prosecution under Virginia law. The parties have filed cross motions for summary judgment. [Doc. Nos. 66 and 68] (the "Cross Motions"). The Court held a hearing on the Cross Motions on May 24, 2019, following which it took them under advisement. Based on the undisputed facts, the Court concludes that the Plaintiff was subjected to a constitutionally valid *Terry* stop and his subsequent arrest for refusing to identify himself did not violate his constitutional rights under the Fourth Amendment. As explained in more detail below, Plaintiff's motion for summary judgment is accordingly DENIED; Defendants' motion for summary judgment is GRANTED; and this action is DISMISSED.

### I. BACKGROUND

The following facts are undisputed:

On April 25, 2017 at or about 1:39 a.m., Defendant Scott Fulford, a Stafford County Sherriff's Office deputy, was on patrol and traveling northbound on Jefferson Davis Highway in

1

Stafford County, Virginia. Defs.' Statement of Undisputed Facts ¶ 1. As Deputy Fulford passed 3893 Jefferson Davis Highway, he noticed a vehicle stopped on the right side of the southbound lane, partially in the lot owned by the CarStar used car dealership, with its hood up and lights on. *Id.* ¶ 2; Pl.'s Statement of Undisputed Facts ¶ 5. Deputy Fulford turned his cruiser around and pulled up about ten feet behind the vehicle, a 2016 Ford Focus, to see if the driver of what appeared to be a disabled vehicle needed assistance. Defs.' Statement of Undisputed Facts ¶¶ 3-4, 20.

When Deputy Fulford pulled up, the stopped vehicle was idling with its headlights and taillights on, but not its hazard lights. *Id.* ¶ 4; Pl.'s Statement of Undisputed Facts ¶ 3. The CarStar lot was dimly lit and the stopped vehicle was parked partially in the CarStar lot, approximately four or five feet from the nearest vehicles in the lot. Defs.' Statement of Undisputed Facts ¶ 4. The CarStar lot is located in an area with a history of criminal activity, especially pertaining to vehicular crimes, larcenies, and break-ins. *Id.* ¶¶ 15-18. There had also been a recent spike in vehicular larcenies in Stafford County during that month, and Deputy Fulford was aware that County deputies had been looking for vehicular larcenies/break-ins earlier that day, although not specifically in that immediate area. *Id.* ¶ 9.[1]

---

[1] Plaintiff and Defendants have both presented detailed statistics concerning the level of criminal activity in the area, and Plaintiff disputes the characterization of the location where his vehicle stopped as "a high crime area." *See id.* ¶¶ 16-17; Pl.'s Reply at 4-6. Briefly summarized, those statistics show that: (1) in the seven years prior to this incident, the CarStar property had 8 reported larcenies, 4 suspicious person reports, 6 business alarm triggers, 2 crime prevention checks, and a building check; and (2) in the six to seven years prior to this incident, the 820 foot commercial property area in which the CarStar property is located had 18 reported larcenies, 40 business alarms triggered, 51 suspicious persons and/or suspicious vehicle reports, 20 crime prevention checks, 10 specific building checks, 5 car alarm checks, and 2 vandalisms. Defs.' Statement of Undisputed Facts ¶¶ 16-17. However one characterizes the level of criminal activity at or in the immediate vicinity of the CarStar lot, Deputy Fulford knew generally that Stafford County had experienced a spike in vehicular larcenies in the month prior to this incident and that a teen had been apprehended in connection with vehicular break-ins in the same zone a few days before, although he did not know the specific history of incidents at the CarStar lot and its immediate surroundings. *See id.* ¶¶ 9, 12; *see also* Pl.'s Ex. 4 at 159:14-22.

As Deputy Fulford exited his cruiser, Mr. Wingate immediately got out of his vehicle without being prompted and began walking away from his vehicle and towards Deputy Fulford, conduct that Deputy Fulford considered unusual since in his experience a person whose car is disabled typically stays inside his vehicle when approached by law enforcement. *Id.* ¶¶ 5, 7. Deputy Fulford also noted that Mr. Wingate was wearing all-black clothing, including a black track jacket, black pants, and black shoes, similar to suspects apprehended for a recent string of late-night vehicle larcenies in Stafford County. *Id.* ¶¶ 8, 11.

Deputy Fulford asked Mr. Wingate what was wrong with the vehicle and if he needed help, to which Mr. Wingate responded that he was having "engine troubles" and was checking his engine codes, a response Deputy Fulford considered questionable, given that the car's engine appeared to be running and idling without issue. *Id.* ¶¶ 19-20; Pl.'s Statement of Undisputed Facts ¶ 8. Deputy Fulford then asked Mr. Wingate where he was coming from and going to and Mr. Wingate responded that he was coming from "Alexandria" and going to his "girlfriend's house." Defs.' Statement of Undisputed Facts ¶ 21. When Deputy Fulford followed up by asking Mr. Wingate where his girlfriend lived, he said "Stafford" but did not volunteer any further information. *Id.* ¶ 22. Deputy Fulford then asked Mr. Wingate to provide identification. *Id.* ¶ 25. Mr. Wingate refused and asked Deputy Fulford why he needed to provide identification. *Id.* The situation deteriorated quickly thereafter.

Deputy Fulford pressed for identification; Mr. Wingate continued to refuse. *Id.* ¶¶ 25-26; Pl.'s Opp. at 9. Deputy Fulford activated his body mic, which in turn activated his cruiser dash cam recording, and called for backup. Defs.' Statement of Undisputed Facts ¶¶ 28-29, n.2. He then informed Mr. Wingate that a Stafford County ordinance required him to identify himself. *Id.* ¶ 27. Mr. Wingate again refused to do so and asked if he had committed a crime and if he was

3

being detained. *Id.* Deputy Fulford informed Mr. Wingate that he was not being accused of a crime at this time, but that he nevertheless needed to identify himself. *Id.* ¶ 30. Mr. Wingate stated that if he was not being detained, he was free to go but Deputy Fulford informed him that he was not free to go until he identified himself. *Id.* ¶ 31.

Before back-up arrived, Deputy Fulford asked Mr. Wingate what specific problems he was having with his engine, and Mr. Wingate said it was "stuttering" and "misfiring," and that he had been "reading the [engine] codes." *Id.* ¶¶ 36-38. Deputy Fulford did not believe this statement to be true because Mr. Wingate did not appear to have an OBD-II code reader and his car was running, although, unknown to Deputy Fulford, Mr. Wingate was referring to his reading codes through an app on his phone while his car idled. *Id.* ¶¶ 39-40; Pl.'s Statement of Undisputed Facts ¶ 4. Deputy Fulford again asked if Mr. Wingate would provide his license, and Mr. Wingate replied that unless he had committed a crime, he did not "feel the need to." *See* Defs.' Statement of Undisputed Facts ¶¶ 41-45.[2]

Defendant Dimas Pinzon, a lieutenant in the Stafford County Sherriff's department, arrived at approximately 1:42 a.m. *Id.* ¶ 47. Lt. Pinzon regularly patrolled the area and considered it to be a high crime area for vehicular larcenies. *Id.* ¶¶ 47-48. Lt. Pinzon observed Mr. Wingate refusing to identify himself to Deputy Fulford, noted Wingate's all-black clothing and the location of the vehicle, saw no obvious signs that the vehicle was disabled, and informed Mr. Wingate that it was strange that he was at that location at nearly two in the morning. *See id.*

---

[2] The dash cam video of the encounter, which appears to begin a couple minutes after Deputy Fulford's initial encounter with Mr. Wingate, has been submitted. Both parties urge the Court to review and rely on that video, rather than the parties' characterizations of their conduct shown in the video. *See Scott v. Harris*, 550 U.S. 372 (2007). The Court has reviewed the video in detail but, given the reasons for the Court's decision, as set forth in this Order, finds no material issues of fact that need to be resolved based on that viewing because of the parties' respective characterizations of their conduct.

¶¶ 47-52. Mr. Wingate stated that he did not commit any crimes, and Deputy Fulford replied that nobody said he had committed a crime, and that all they were asking for was his ID. *Id.* ¶¶ 53-54.

When Mr. Wingate continued to refuse to provide his ID, Lt. Pinzon informed him that he was now committing a crime, specifically, a violation of Stafford County Ordinance § 17-7(c), which states that it "shall be unlawful for any person at a public place or place open to the public to refuse to identify himself, by name and address, at the request of a uniformed law-enforcement officer if the surrounding circumstances are such as to indicate to a reasonable man that the public safety requires such identification." *Id.* ¶¶ 56-58. Mr. Wingate nevertheless continued to refuse to provide his ID; and Lt. Pinzon then informed him that he was now being detained, and that he was on the cusp of being arrested for failure to provide identification. *Id.* ¶¶ 57-61. Lt. Pinzon again asked Mr. Wingate to identify himself and in response, Mr. Wingate laughed and said, "[I]t doesn't matter who I am." *Id.* ¶ 62. The officers then moved to arrest Mr. Wingate, who tensed up, physically struggled with the officers, eventually broke away and ran, and then was brought to the ground and successfully handcuffed. *Id.* ¶¶ 63-66.

Mr. Wingate was subsequently charged with failure to identify himself pursuant to Stafford County Ordinance § 17-7; obstructing justice under former Va. Code § 18.2-460; resisting arrest under former Va. Code § 18.2-479.1;[3] and possession of an "open" (i.e., unsigned by the buyer) automobile title, which was found during an inventory search of Mr. Wingate's vehicle post-arrest, under Va. Code § 46.2-618. *Id.* ¶ 67. On July 20, 2017, the day of Mr. Wingate's trial on these charges, Deputy Fulford learned from the Assistant Commonwealth's Attorney that the Commonwealth would be moving for a *nolle prosequi* dismissal of the charges because Mr. Wingate's defense attorney challenged the constitutionality of Stafford County

---

[3] Va. Code § 18.2-479.1 was repealed in 2018, and both resisting arrest and obstruction of justice have been re-codified under current Va. Code § 18.2-460.

5

Ordinance § 17-7 and he did not want to litigate that issue. *Id.* ¶ 68. Several months later, Deputy Fulford was told during a roll call that deputies were not to use Stafford County Ordinance § 17-7 any longer, even though the law remained valid and on the books. *Id.* ¶ 70. Prior to being instructed during this roll call not to rely on § 17-7, Deputy Fulford was never told not to enforce that ordinance. *Id.* ¶ 71.

Plaintiff brought this action on July 30, 2018 [Doc. No. 1] and filed his Second Amended Complaint on February 13, 2019 [Doc. No. 46], in which he brings claims against Deputy Fulford and Lt. Pinzon for (1) Fourth Amendment violations arising out of his seizure and arrest for refusal to give his name (Counts I and II); (2) false imprisonment for refusal to provide his name, obstruction of justice, and resisting unlawful arrest (Counts III, V, and VII); and (3) malicious prosecution for refusal to give his name, obstruction of justice, and resisting unlawful arrest (Count IV, VI, and VIII). Now pending before the Court are the parties' Cross Motions for Summary Judgment.

## II. Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996). The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat

an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48.

A "material fact" is a fact that might affect the outcome of a party's case. *Id.* at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *Hooven–Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *Anderson*, 477 U.S. at 248. Rule 56(c) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The nonmoving party "cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Deans v. CSX Transp., Inc.*, 152 F.3d 326, 331 (4th Cir. 1998) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) (internal quotations omitted)). "

"[W]hen faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." *United States v. Austal USA LLC*, 815 F. Supp. 2d 948, 955 (E.D. Va. Feb. 28, 2011) (quoting *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)) (alteration in original). Instead, the court must ask "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251; *see also Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) ("[T]he court must review each motion

separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" (citations omitted)). The court is not to "weigh the evidence and determine the truth of the matter." *Anderson*, 477 U.S. at 249.

### III. Analysis

As the parties agree, the dispositive issue on the parties' Cross Motions for Summary Judgment is whether Plaintiff's initial seizure and subsequent arrest for refusing to provide identification violated his Fourth Amendment rights. The parties also agree in that regard that the critical inquiry is whether the totality of the circumstances were sufficient for the Defendants to engage in a *Terry* investigative stop of Mr. Wingate.

The Fourth Amendment affords "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. A law enforcement officer is permitted to seize a person for a brief investigatory stop if he "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *see also United States v. Bumpers*, 705 F.3d 168, 179 (4th Cir. 2013). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Courts must look to the totality of the circumstances in determining whether the officer had reasonable suspicion of criminal activity. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* (internal citation omitted).

8

In assessing whether Mr. Wingate was subjected to a constitutionally valid *Terry* stop, the Court must first determine when he was "seized" and the totality of the circumstances known to the seizing law enforcement officer at that point in time. "As a general matter, law enforcement officers do not seize individuals 'merely by approaching [them] on the street or in other public places and putting questions to them.'" *United States v. Stover*, 808 F.3d 991, 995 (4th Cir. 2015) (quoting *United States v. Drayton*, 536 U.S. 194, 200 (2002)). "Rather, as the Supreme Court has explained, '[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.'" *Id.* (quoting *Terry*, 392 U.S. at 19 n. 16). Where "physical force is absent, a seizure requires both a 'show of authority' from law enforcement officers and 'submission to the assertion of authority' by the [person seized]." *Stover*, 808 F.3d at 995 (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991). "'Without actual submission' to the show of authority, "there is at most an attempted seizure, which is not subject to Fourth Amendment protection." *Id.* at 996 (quoting *Brendlin v. California*, 551 U.S. 249, 254 (2007)). In determining when a person has been "seized," courts look to when "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (plurality opinion).

Here, based on all the facts and circumstances, the Plaintiff was "seized" by Deputy Fulford for an investigatory stop pursuant to *Terry* prior to Lt. Pinzon's arrival on the scene, when Deputy Fulford first told Mr. Wingate that although he was not under arrest, he was not free to leave until he identified himself.[5] At that point in time, a reasonable person in Mr.

---

[5] The Court therefore rejects Defendants' contention that Plaintiff did not actually submit to shows of authority from Deputy Fulford and Lt. Pinzon until his physical apprehension and was therefore not effectively "seized" for purposes of the Fourth Amendment until the officers attempted to place him under arrest for violating Stafford County Ordinance § 17-7.

9

Wingate's position would not feel free to leave after being informed that he was not free to do so and was being detained until he identified himself. Moreover, Mr. Wingate's actions are consistent with a belief that he was not free to leave, as he submitted to Deputy Fulford's order and made no attempt to leave after Deputy Fulford told him he was not free to go until he was placed under arrest. *See United States v. Slocumb*, 804 F.3d 667, 679-80 (4th Cir. 2015) (defendant was seized when he was advised by a police officer that he was not free to leave and abided by that order, though he refused the officer's request to search his person).

The question then becomes whether Deputy Fulford had constitutionally sufficient suspicion of criminal activity to warrant a brief investigatory *Terry* stop of Mr. Wingate when he was first seized. Constitutionally sufficient suspicion is reasonable suspicion. "Reasonable suspicion is a commonsensical proposition. Courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993). Additionally, "individual facts and observations cannot be evaluated in isolation from each other." *United States v. Hernandez–Mendez*, 626 F.3d 203, 208 (4th Cir. 2010). Indeed, factors "susceptible to innocent explanation" individually may "suffice[] to form a particularized and objective basis" for a *Terry* stop when taken together. *Arvizu*, 534 U.S. at 277. And "the existence of a plausible innocent explanation does not preclude a finding of reasonable suspicion." *United States v. Pettit*, 785 F.3d 1374, 1381 (10th Cir. 2015), *cert. denied*, 136 S. Ct. 282 (2015); *see also United States v. Raddon*, 634 F. App'x 216, 219 (10th Cir. 2015) (rejecting defendant's claim that the evidence "could just as easily suggest innocent behavior" because "[e]ven if these possibilities were plausible, they would not preclude reasonable suspicion"). Additionally, "a reasonable belief, even if it is mistaken, can justify an investigative stop." *United States v. Trogdon*, 789 F.3d 907, 913 (8th Cir. 2015).

10

Reasonableness is "measured by what the officers knew before they conducted their search," not what they learned after the fact. *Florida v. J.L.*, 529 U.S. 266, 271 (2000).

While a person's location in a high crime area is not sufficient standing alone to support a reasonable, particularized suspicion of criminal activity, "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Wardlow*, 528 U.S. at 124. That a stop occurs in a "high crime area" is among the relevant contextual considerations in a *Terry* analysis, and the Fourth Circuit has regularly found that whether or not a location is in a high crime area, the time of night or lateness of hour and the fact a business has been closed or unoccupied for many hours are permissible, objective factors that can contribute to a finding of reasonable suspicion in the totality-of-the-circumstances-analysis. *See, e.g., United States v. Glover*, 662 F.3d 694, 698 (4th Cir. 2011) (considering the high-crime area and lateness of the hour); *Lender*, 985 F.2d at 154 (same); *United States v. Smith*, 396 F.3d 579, 586-87 (4th Cir. 2005) (considering lateness of the hour where location was not a high crime area). Additionally, furtive movements in response to the officer's presence, evasive and resistant behavior, and contradictory or inconsistent responses are all additional factors upon which law enforcement officers can base reasonable suspicion that criminal activity is afoot. *See e.g., Hernandez–Mendez*, 626 F.3d at 212-13 (defendant being evasive and untruthful in her responses to officer's questions contributed to reasonable suspicion to frisk for weapons); *United States v. Wilson*, 46 F.3d 1129 (4th Cir. 1995) ("Wilson provided multiple evasive and contradictory responses to the agents' questions, appeared nervous at each stage of the questioning, and refused to acknowledge ownership of the suitcase he was carrying"); *United States v. Ghazaryan*, 685 F. App'x 222, 224 (4th Cir. 2017) (officer reasonably believed defendant's answers to initial inquiries about recently visiting banks were

untruthful, and thus had reasonable suspicion of criminal activity under the totality of the circumstances).

Here, Deputy Fulford was aware of multiple factors that when weighed together amounted to reasonable suspicion sufficient to convert what was initially a stop to assist a disabled vehicle to a brief, permissible investigatory stop under *Terry*. Deputy Fulford observed Mr. Wingate's vehicle idling with its hood up at the CarStar lot at roughly 1:39 a.m. The vehicle was located in the dimly lit parking lot of a closed and empty business late at night, near parked CarStar cars, despite better lit areas just down the road, during a period of increased vehicular larcenies and in an area known for prevalent vehicular crimes.

Given the totality of these circumstances, Deputy Fulford had an articulable and objective basis for a brief investigatory *Terry* stop. Critical to that determination is the time of the encounter (early morning) and the location of Mr. Wingate's vehicle, *viz.*, partially on a private used car lot, adjacent to used cars, of a closed business that had been the victim of criminal activity in the past and at a time when vehicular related crime had spiked throughout the county. And although without these facts, the Court would reach a different conclusion, Mr. Wingate also engaged in other conduct that, when considered in light of these critical facts pertaining to time and location, further justified the *Terry* stop (even though that conduct was insufficient by itself), including (1) immediately exiting his vehicle without any prompting as Deputy Fulford exited his cruiser; (2) wearing all-black clothing similar to the suspects identified and apprehended during the recent increase in late-night vehicular larcenies in Stafford County; and (3) explaining his presence in the used car lot as the result of engine trouble given that the car appeared to be running and idling without issue. That Mr. Wingate's explanation for his presence may have proven true, that he understandably viewed Deputy Fulford's insistence on his

identifying himself as an implicit, and unwarranted, accusation of criminal activity, and that from his perspective, he was fully within his rights to refuse to provide identification does not negate that when the totality of the circumstances are viewed from the perspective of Deputy Fulford, Deputy Fulford had a reasonable suspicion "that criminal activity may be afoot" at the time he informed Mr. Wingate that he was not free to go until he identified himself. Defendants are accordingly entitled to judgment as a matter of law as to Count I.

When Mr. Wingate refused to provide identification, Defendants also had sufficient probable cause to arrest him for violating Stafford County Ordinance 17-7 and are thus entitled to summary judgment with respect to Count II. In *United States v. LeFevre*, 685 F.2d 897 (4th Cir. 1985), the Fourth Circuit conducted a Fourth Amendment analysis of Arlington County's Ordinance § 17-13(c), which is essentially identical to Stafford County Ordinance 17-7(c). In *LeFevre*, the officer had knowledge of reports that a gang fight could occur that night in the area, and observed a man sitting on a wall across the street licking two rolling papers with a pack of pre-rolled commercial cigarettes beside him. 685 F.2d at 899. When approached by law enforcement, the man "quickly placed his hands in his pockets" and "became very nervous." *Id.* The officer asked LeFevre who he was and what he was doing, and he gave no answer. *Id.* She repeated her question and LeFevre replied "why," got down off the wall, and began backing away "stating that he was not doing anything and wanted to be left alone." *Id.* The officer then placed LeFevre under arrest for violating Section 17-13(c). *Id.*

The Fourth Circuit held that the officer was initially justified in conducting a *Terry* investigatory stop and had sufficient probable cause to arrest LeFevre pursuant to Section 17-13(c), and, specifically, to believe that the "public safety" required the identification of the suspect. *Id.* at 900. Specifically, the Court found four factors that when viewed collectively

13

supported a finding of probable cause: (1) the reports of an armed gang fight that was to occur that evening; (2) LeFevre's licking two rolling papers coupled with having a pack of commercial cigarettes; (3) his furtive movements upon being approached by the officer; and (4) his repeated refusal to identify himself. *Id.* The Court deemed these circumstances "sufficient to warrant a prudent person's belief that [LeFevre] was a threat to 'public safety' and should identify himself." *Id.*

Though the exact circumstances here differ from those in *LeFevre*, the totality of the surrounding circumstances could cause a reasonable person to conclude that the public safety required Mr. Wingate to provide identification. Upon Mr. Wingate's continued refusal to do so despite the officers' explanation as to the requirements of the ordinance, there was probable cause for his arrest pursuant to § 17-7(c), and his arrest therefore did not violate the Fourth Amendment.[6] Accordingly, Defendants are entitled to summary judgment with respect to Count II.

Even assuming that Wingate's seizure and arrest pursuant to § 17-7 violated his Fourth Amendment rights, Defendants are entitled to qualified immunity and summary judgment in their favor would therefore be appropriate. Qualified immunity is designed to provide a safe harbor from liability to ensure that officers will be held liable only for transgressing bright lines and not for making "bad guesses in grey areas." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). Applied properly, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal

---

[6] Plaintiff does not challenge the constitutionality of Stafford County Ordinance § 17-7 but rather its application to him here. And even had he done so, "an arrest, made in good faith reliance on an ordinance, which at the time has not been declared unconstitutional is valid regardless of a subsequent judicial determination of its unconstitutionality." *LeFevre*, 685 F.2d at 901 (citing *Michigan v. DeFillippo*, 443 U.S. 31 (1979)). There has been no such judicial determination of § 17-7's unconstitutionality here, although Stafford County deputies have since this incident been directed to no longer charge individuals under the ordinance.

quotation marks omitted). In determining whether officers are entitled to qualified immunity, the Court assesses whether the officer's conduct was reasonable under the circumstances known to the officer at the time of the complained of actions. *Hunsberger v. Wood*, 570 F.3d 546, 555 (4th Cir. 2009). If the officer's conduct does not violate a constitutional right, qualified immunity applies and bars suit. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Even if there is a question as to whether a plaintiff's constitutional rights have been violated, qualified immunity still applies unless the "official's conduct violated a clearly established constitutional right." *Id* In assessing whether the officers' conduct violated a clearly established constitutional right, the relevant question is "the objective (albeit fact-specific) question whether a reasonable officer could have believed [his actions] to be lawful, in light of clearly established law and the information the . . . officers possessed." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). It is within the discretion of the district court to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

Deputy Fulford and Lt. Pinzon did not violate a clearly established constitutional right. Based on what Deputy Fulford and Lt. Pinzon saw and knew, they had probable cause to justify an arrest. The officers also had a good faith belief at the time that § 17-7 was valid and constitutional and that they were acting within the scope authorized by that statute. Thus, objective officers in Deputy Fulford's and Lt. Pinzon's positions could reasonably believe, given the circumstances known at the time, that arresting Mr. Wingate following his repeated refusals to identify himself was supported by probable cause.

Finally, because Defendants are entitled to summary judgment as to Plaintiff's Fourth Amendment claims, his remaining state law claims must fail as a matter of law. Because the

seizure was supported by an articulable reasonable suspicion of criminal activity and the arrest was supported by probable cause, Defendants are also entitled to summary judgment with respect to Plaintiff's malicious prosecution and false arrest/imprisonment claims based on Defendants' actions after the initial seizure and subsequent arrest.

### IV. Conclusion

For the reasons stated above, based on the undisputed facts, Defendants are entitled to judgment as a matter of law as to all counts. Accordingly, it is hereby

ORDERED that Plaintiff's Motion for Summary Judgment on Liability [Doc. No. 66] be, and the same hereby is, DENIED; and it is further

ORDERED that Defendants' Motion for Summary Judgment [Doc. No. 68] be, and the same hereby is. GRANTED; judgment in favor of defendants and against plaintiff be, and the same hereby is, entered; and this action is DISMISSED.

The Clerk is directed to enter judgment in accordance with this Order pursuant to Fed. R. Civ. P. 58.

_____/s/_____
Anthony J. Trenga
United States District Judge

May 31, 2019
Alexandria, Virginia

16